The next case is number 2011-1399, Muran Incorporated and others, against Mylan Pharmaceuticals and others. Mr. Wallace. Thank you, your honors. May it please the court. There are three main issues I would like to address, the propriety of the injunction after the invalidity ruling, invalidity based on obviousness, and invalidity based on best mode. And I'll take them in that order unless the court has a stronger preference. On the injunction issue. What is left with the injunction issue? I mean, was there harm during the short period of time that it was still in place? Well, the injunction was put into place by the district judge. Then it was stayed by the federal circuit for three or four or five days. And then the stay was removed. So the injunction is in place today. And so the harm, and this, your honor, to the best of our knowledge, after thorough research, this is the first time that a generic drug company, after obtaining an invalidity ruling, and making a unquestionably legitimate launch of commercial product, thereby triggering the 180 day exclusivity period to running. This is the first time we've ever found that in that circumstance, the prevailing generic drug company was enjoined from further marketing during this 180 day exclusivity period. And so approximately half of the 180 day period has now been wasted with us not being on the market. The question is really whether that lost period should be restored. Is that a simple remedy for whatever may have been, if it were done wrong? Certainly, we would hope that a court would find a way to do that. We have been unable to find a court that has found out a statutory way to restore that. There's no contention by the patentees that that period could be restored. Is the bond inadequate to? The bond is clearly inadequate, Your Honor. I'm glad you asked that question. The bond, the $10 million bond, was based on a declaration from a businessman from plaintiffs, who made assumptions based on his experience with the similar product, as to what Mylan's cost would be, what Mylan's selling price would be, and what Mylan's profit would be. The judge bought his $10 million figure based on his projections without access to Mylan's cost, Mylan's selling price, Mylan's sales. The district judge- Well, did Mylan put in any alternative? We certainly did. We put in the president of our company a declaration based on his actual cost, his anticipated selling price, and anticipated sales. And it's a substantially larger figure. The district court did not even acknowledge that that declaration had been filed. She gave no weight to one versus the other. She just bought the plaintiff's declaration and said, that's the number, without any further consideration. So, as I say, as far as we can tell, this is the first time a generic company has ever been enjoined after succeeding in proving invalidity and making an unquestionable, legitimate launch of its product. The 180 days started ticking on, I believe it was May 13, and we were on the market for two or three days. Then we were off the market. Then we were on the market when the federal circuit first stayed the injunction, and then when the federal circuit restored the injunction, we were off the market again. So- So, is the issue, is the question, you want us to decide whether the district judge saying that it was, I think she said, as likely as not that she would be reversed, whether that's sufficient to, in that case, decline the injunction? That's absolutely right, Your Honor. That is not a proper standard for the injunction. It would have to do a bit of finding that it's more likely than not that I'll be reversed on appeal? That's correct. And, Your Honor, that's the odd situation about this case. Under the district judge's unprecedented standard for doing this post-decision injunction, it has made it easier for a patentee to get injunctive relief after they've lost the case. No, I don't think so. I think it was a matter of how much weight was given to the relative harms. Under the balance of harms, at least that's what the district judge seemed to think. But she has adopted this just as likely as not, which is unprecedented. But that's only one of several factors for an injunction. Well, that's what she said in a post-adjudication thing. She was going from the gatekeeper function of likelihood of success to the balancing test, and we submit under Third Circuit law and other circuits that the test after an adjudication should have been more likely than not, and particularly for a second. Every circuit includes the relative harms, the balance of harms, and the public interest in considering the injunction. That's true in a preliminary injunction since prior to an adjudication. Here, there had already been an adjudication of invalidity, which the judge, in her further decisions when the plaintiffs were attacking it, has said, I'm standing by it. I'm sticking by my decision. She went through their, I believe it was five factual points that they said were error, such as naming the wrong witness for certain testimony and so forth, that said they were all harmless. She admitted she named the wrong witness, but she said there were several other witnesses who gave compelling testimony on that. Do you read the judge's conclusion in this regard, which admittedly is unusual, but do you read her conclusion in this regard as her belief that it was so close that maybe she got it wrong, or was it simply saying that Federal Circuit is a crapshoot? Well, I don't think she would. She's a very nice lady, and I don't think she would use such language in referring to the Federal Circuit. But I think she got it wrong. She didn't appreciate that under the statutory scheme, there are three junctures at which a generic company can go on the market legitimately. And she clearly would have preferred that the litigation process play itself out to a conclusion. Now, if I could briefly address the obviousness point, the judge heard, I believe it was a seven-day trial, bench trial, of course, as Hatch-Waxman. She heard compelling evidence about the high probability, high likelihood of success in formulating this product. The immediate release product had been on the market commercially for I think it was 30 or 40 years. There was prior art showing that this chemical entity had been put into extended release vehicles, and it was reported as successful. The evidence that the judge heard, and that's why we say she got it right in her findings, she heard that this is- You're saying there was prior art. You said there's prior art that showed that success with this product in an extended release formulation? The urban reference. Well, it referred to it generally, but didn't talk about it as being successfully tried, did it? Well, it didn't say that it had been marketed. I agree with your honor. It just listed this among a whole list of many things that were possible. That's correct. But didn't say that there had been clinical trials or any effort. If I suggested that, I misspoke, because I do not believe anybody did clinical trials. Is it your contention, essentially, that any time you have an immediate release formulation, that it would be obvious to try an extended release formulation and it would be obvious to shoot for bioequivalence, and that we should just say as a matter of law, that's always the case? I think that would be an overstatement, and we certainly don't need to suggest that in this case. Let me tell you the evidence that Judge Robinson heard in getting it right. She heard that this chemical entity was what they call, formulators call, a type 1 drug or a category 1 drug. It was highly soluble. Its absorption as it goes through the gastrointestinal tract was relatively uniform, and various other characteristics about this drug, which indicated that it would be a prime candidate for an extended release. The issue about its absorption is highly debated, isn't it? There was factual evidence and contentions by both sides that were conflicting. The district judge is the trier of fact, heard the witnesses, she read the documents, and she came to the conclusion that this drug, because of its chemical characteristics, would lead one to believe that there was a high likelihood of success. Your opponent, actually, I think we've reversed the sides of the opponent here, is going to point to the several major pharmaceutical entities who should know what you've just been telling us, and that they had tried and failed to prepare a time release. Well, I will not agree with that, Your Honor. I will agree that's what they're saying. But what they point to is failures. They point to shering plow, and they point to Merck, where there was evidence. I think Merck got a patent. There was no evidence as to why Merck did or did not market the drug. Shering plow wrote an article. There was no evidence as to why they decided not to commercialize the product. Total failure of proof. Was there evidence that they did get the drug? No, there was evidence that they worked with it. There was no evidence as to whether or not they considered commercializing. There's just no representative of Merck or Shering at the trial to say, although you got Mr. Merck, although you got a patent, why didn't you market the drug? Why didn't you go to clinical trials? Was it a commercial decision? What was it? Absolutely no evidence. With Alza, the Alza representative said Alza was trying not to mimic with an extended release drug, the three times a day Flexeril, but to come up with a different dosage profile that would solve insomnia problems. And as Judge Robinson correctly found after listening to that evidence, Alza's objective was to accomplish something different from what Uran was trying to accomplish. If Uran was trying to have a therapeutically effective product, why wouldn't it also be consistent to conclude that one of the things they wanted to do was do away with side effects? Well, that's interesting. They raised that question. The insomnia issue was one that they would like to have done away with. There are admissions from Uran and Cephalon that they could not prove that their once-a-day product eliminates those side effects. There was no statistical evidence. There is no label indication on their product indicating that the insomnia problem has been solved. Sure. I'm sure they would have liked to, but they didn't do it. Just very briefly on best mode, the district judge got it right. She said they had a best mode. She said the best mode improved the quality of the product and the production process. But then she said because she concluded the setting of the dew point was routine. We submit as a matter of law that is wrong because the very same inventors years later, based on the earlier data, filed a patent application and says, this is not routine. This is so significant. We deserve a patent on this dew point in the manufacturing process. The inventor, Bangladesh, admitted this was the same dew point data that he had before he filed the two patents that were in fact, to save just a little time, Your Honor, for rebuttal. Thank you, Mr. Wattis. Mr. Singer. Good morning. May it please the court. I think Judge O'Malley said this was an unusual pasture that were here, and I think we all agree with that. The circumstance where the district judge, district court, found clear and convincing evidence of obviousness in her original opinion, but then when presented with arguments post-trial, made a series of statements about the strength of those findings, and ultimately said that our clients had presented a substantial case, which is what the quote that she used at JAB 125. But she did leave it at equipoise, though, didn't she? I mean, at best, she gave you 50-50. Well, I think that's a, she said, as likely as not, and I think one can fairly translate that to 50-50 if we're going to do the mathematics. But that doesn't change whether or not the injunction was proper. I mean, this is the circumstance under. You lost the case. We lost the case if the district court pulled it. How can we not but find error on that part, or affirm, rather? With respect to 62C or the? No, how can we not but find error on the part of the district court in the summary judgment? In adjoining, there was not error because of the balancing test that exists under Rule 62C. Essentially, what the argument is is if the party losing has to show either an, I think it was already an overwhelming likelihood of success on appeal, or more likely than not success on appeal, we're not going to have a Rule 62C. Because Rule 62C, at some level, presupposes that someone has lost something, and they're seeking to say what has happened. And here, she balanced the harm. This is an intellectual property case. It's, at some level, not different than regular property. Even in balancing the harms, didn't she ignore the fact that she had allowed a period of time to lapse and Mylon had launched? Well, two things on that. One, she said it was financially, that was a financial harm, that that could be compensated through money. But the other thing she said in that regard was that it was self-inflicted harm, that this was a circumstance where the law doesn't require Mylon to launch. That was a change that Congress made in the MMA Amendments to the Hatch-Waxman Act in 2003, so that generic drug companies wouldn't have to launch at risk in order to obtain their exclusivity. And this is a balancing process, this statute. We have a desire to incentivize pioneer companies to develop new drugs, and a desire to incentivize generic companies to make generic drugs. And one way to balance that through the exclusivity period is not to require generics to launch in the event of a very close case and destroy, essentially, the market for the branded drug. And that's, I believe, why the injunction was proper. She balanced those harms and essentially said, if I let this go on, the market will be gone. There's irreparable harm that will result. If a year from now or six months from now the plaintiff comes back, they will have lost that market and suffered, essentially, irreparable harm What was the backup? What was the support for this $10 million figure? It seems like an awfully low figure. Well, the backup was a calculation by Cephalon representative of what the price in the market was, what the expected sales would be of a generic product in the period of the injunction, what the competing sales might be, and a price, sort of a price numbers calculation. And remember, the generic drug is sold for a much lower price. And so the issue is whether or not a higher branded price is then supported when you have a generic in the market. It's not. The price falls quite quickly, and the generic is substituted quite quickly. And that was the basis of refining on the bond amount. And if I could turn to, I think, the reason why she entered the injunction was with respect to the errors. And while she's stuck by her opinion, I think that's correct, she said that. I think it would be helpful, to me at least, if you used your remaining time to discuss the merits on which you, if you don't obtain reversal of the rest of this. That's exactly where I was going, Your Honor. Thank you very much. And do you really think it strengthens your argument to refer to the district court as being slipshod in her approach? And, Your Honor, I apologize for using that kind of language. I take full responsibility for that, and I don't. I apologize for using any language. It might feel good at the time to write something like that, but in retrospect. Your Honor, you're absolutely correct. There were several other references that were similar along the same vein, and I thought were disrespectful to the district. And I take full responsibility for that, and it will not happen again. But with respect to the errors that were pointed out, that we would ask the court to focus on, they really focus on claim three, in terms of the problem that the inventors solved here with respect to figuring out what would be therapeutically effective here. The invention relates to whether or not one could make a therapeutically effective formulation of the cyclobenzaprine in an extended release. And we start with the prima facie case that the court made, which focused heavily on the key Winchell reference. And from the key Winchell reference, the district court determined that the pharmacokinetic profile originally, in her original opinion, was, quote unquote, disclosed in Winchell. And that's simply incorrect. Neither party had argued that Winchell actually disclosed the pharmacokinetic profile, either of the extended release product or the immediate release product. The district court then went on to correct herself when it was pointed out that that was not an argument that either party had made, that the CMAX was, quote, indisputably disclosed. And that's at JA 116. And again, that is incorrect as well. That was what she felt back on, that the CMAX was disclosed. And then one could then calculate according to her findings the other parameters. The CMAX, if you actually look at it, that she cited, is not within the claims. It's also a steady state CMAX, which is going to be very different than what is within the claims. So what we have is a super, excuse me, a transposition, if you will, two things. A number, 26, roughly 25.9. It's actually not within the claims. And the number two, a different type of data. Your opponent would argue that even if we accept the fact that the district judge made a series of errors in certain of her findings, that there's enough other evidence to support the ultimate conclusion. Well, and in response to that, what we would say is that she made the error in the prima facie case on Winchell. And then she conducted sort of a gap-filling exercise to find the other parameters, if you will. Because I think she went through each of the errors that we identified and argued again here. And we walked through them. And putting, OK, Winchell, that's the error we described in our brief with the CMAX. Then if you gap-fill with, essentially, what we had was conclusory testimony by Dr. Fletcher. And we talked about Dr. Fletcher in his brief, that one could then essentially model from the prior art particular numbers, and you would inevitably reach the numbers in the claims. And number one, it was conclusory. Number two, Dr. Fletcher was admittedly not a person of skill in the art. And number three, it relied heavily on non-prior art. I mean, that's essentially what happened here. We had clinical trials of Flexeril from 2007 that the court then relied on to say, well, look at those clinical trials from 2007 of Flexeril. The two numbers you measured there, they fall within the claims. So therefore, that's sort of an inherent property of Flexeril. But one of the things that Patton stresses, very much so, is that Flexeril, cyclobenzaprine, results in a wide variation of plasma levels, such that it's hard to know, or it is impossible to know, what particular plasma concentration is, in fact, effective. That was something that both sides agreed on, this lack of PK-PD relationship. What would be needed in the prior art to get you to the point of saying that this was obvious? For this particular drug, there would have to be a demonstration that there were some therapeutically effective concentrations of drug, or an in vitro or in vivo correlation to those concentrations, neither of which were present. And that is a big distinction with the other piece of the prima facie case that the court relied upon. And that is the 215 patent, which was related to methylphenidate. And we're not here arguing that we have new extended release technology. That's not what this case was ever about, or new dissolution profiles. It was about the ability to do that which those other companies failed to achieve, a therapeutically effective extended release cyclobenzaprine product, in the absence of information, in the prior art, about what concentrations would be effective to achieve. But you all got it on the second try, right? That's not quite right, Judge, Your Honor. What would happen on the second try is the making of the bead to yield the dissolution profile that had been chosen by the inventors, and the pharmacokinetic profile that their analysis of their own, excuse me, through their modeling exercise. And remember, one can choose any profile one wants as, quote unquote, bioequivalent. There are an infinite number of potential pharmacokinetic profiles that might be bioequivalent. The inventors chose their particular one. And testimony was clear that they considered many different pharmacokinetic profiles. And what they did on the first or second try was say, OK, we can do a dissolution profile that meets what we've modeled. And that goes to the aspect of that's not what the invention is. The invention is what happened before they made the bead that met the dissolution profile. That's what the invention was. Is your argument that the bioequivalence or close to bioequivalence is just coincidental? It's twofold, or threefold. First off, there's an error by the district court in the motivation. The motivation to make a bioequivalent formulation does not exist in the FDA regulations. They don't instruct people to do that. They tell you to do the studies and whatever results results. But then number two, again, in the absence of a relationship between the properties that are measured for single dose bioequivalence, C-max and AUC, in the absence of a relationship in the prior art between those two things and efficacy, that motivation doesn't mean anything, right? I could match C-max. I could match AUC and get a wildly different result. And that's what the patent talks about when it talks about wide fluctuations in plasma levels. And you only need to look at if we're going to consider the later study of flexerol, which we suggest shouldn't be used in a prior art analysis. We shouldn't use a 2007 clinical study to then say that an invention done in 2002 was obvious. If you look at that study, it resulted in certain numbers, 18 for C-max. If you go back and talk about what did other people actually disclose and what did the evidence show at trial, what other people might end up with, it was totally different numbers. Dr. Weiner testified about Dr. Amidon's modeling, that his modeling of the very prior art that was said to be routine to model yielded very different numbers than what plaintiffs measured later on. And that's the tricky part about this drug. The plasma levels were not identified in the prior art, no one of skill, including Dr. Amidon himself. We put that quote in our brief. He said there was no information in the prior art whatsoever. About what would be an effective plasma level. And that's quoted in our reply brief and in our opening brief. Yeah, he said that in the context of talking about written description, though, right? He did. But at some level, that's what a lack of a PK-PD relationship means. And to then go from that to say, well, there's no information about that concentration pharmacodynamic effect, to say, well then, you just aim for bioequivalence, because you then assume that it would have the same effect. Those two things, they don't stand together. They are complete opposites. But if there's no PK-PD relationship, then how can any particular formulation of a release drug be reasonably expected to provide therapeutically expected or effective plasma concentration over a period of 24 hours, such as a claim states? Because that was what our people or the inventors here did. They took a particular plasma profile, which is claimed in claim three, and matched it to a dissolution profile, which is then claimed in claim one. And they are allowed to claim that. Those are the embodiments that they did. Was part of that information that the inventors had related to the prior patent? The 215 patent, Your Honor? The 215. It was not. And in essence, what happened there is, with respect to, again, the invention here is not a novel dissolution profile. The invention is the plasma concentrations in claim three. And in the dissolution profile in claim one yielded the plasma concentrations of claim three. The prior patent, methylphenidate, that relates to methylphenidate, the judge erred and found that it was related to cyclopenzaprine. And that was at JA 100. You'll see that. And she focused on a few similarities, solubility and other things, but did not focus on the fact that if you read the 215 patent itself at column four, it talks about this IV-C relationship for that drug and a PK-PD correlation for that drug. There was a little contradiction in your brief that kind of sung out to me. And that was the difficulty in arriving at this invention, this patent. And yet your inventors did it in days. And again, Your Honor, just to respond again, what they did in days was to make the bead that they said should be made. So if I work for six months or eight months or whatever the amount of time is to create a pharmaceutical PK profile that I think should work, I said, I think this will work. I will do something different than what Alza did. I will do something different than what the conventional wisdom is to cut through the peaks and valleys. I'm going to go real high real early and then come down to real low because I think that will work. Creating a bead to do that was what they did in days. What they did before took many months. And the testimony was that they made many different selections of particular parameters to use. I see my time is out. If there's any other questions. Are there any more questions? No. All right. Not a lot. OK, thank you, Mr. Sagan. Thank you. All right, Mr. Wallace. I'll try to speak very rapidly because I know my time is limited. Can you respond first, though, to this argument that you actually got or somebody from your team got Dr. Amidon to say twice that there's nothing in the prior art that discloses the therapeutic profile? Do you want to address that? Therapeutically effective profile? Yeah. Over, I think, it was a 24-hour period. And there's no evidence in their patent as to what that is. It was our contention that that is an indefinite term. But you didn't appeal the written description of indefiniteness. No, we didn't appeal it. But the point is, obviously, he said it in a different context, but that's the very point that they've been arguing is that the therapeutic profile is in the absence of that. How could it have been obvious? Well, if they had actually found and disclosed a therapeutically effective profile in their patent, perhaps that would be a good argument. But to this date, we don't know what a 24-hour therapeutic dose is. It's not disclosed in the patent. It wasn't disclosed in any testimony by them. It wasn't as though, hey, Eureka, this is our great invention. We said, we don't know what the term means. The judge, relying on certain precedents that therapeutically effective is definite, is not a void for indefiniteness, rejected our claim construction, our challenge of indefiniteness on that. But that was the context in which that was made. That was not their invention. They didn't disclose it. We don't know what it is to the state. Just following up on your earlier question, Judge O'Malley, I should have cited the Rezaghi references, two articles from sharing plow scientist J.A. 2545 to 2563, where they actually wrote articles showing extended-release cyclobenzaprine with extended-release dissolution profiles. This drug in extended-release profiles actually disclosed in those prior articles. One note on the ALZA representative. There was a serious challenge as to whether the ALZA representative actually was retired from ALZA. He was offered up to talk about what happened at ALZA many, many years before without any documentation whatsoever. What Judge Robinson said is, if this were a jury trial, I wouldn't even allow him to testify. But it's a bench trial. She heard the evidence. She concluded that what ALZA was trying to do was different from the objectives of this patent, and therefore that could not be considered a failure of others. Your point, Judge Rainer, about they did it very quickly. They succeeded very quickly. They were told by their client, outside client, I want something bioequivalent to the three times a day. They said, we can do it. They did it in a day or two. They never changed the formula. That was the formula they used for clinical trials and commercial production. There was no evidence they had any difficulty in doing it. And all this business about IV, IV correlations. But you're not telling us they measured bioequivalence in the two days. They made the beads. They measured dissolution profiles, I think, within a couple of days. But they did, without any problem, using the vehicle of the prior Act 215 patent, which had a very similar chemical in its formulation, come up with the formulation that worked without any stated difficulty whatsoever. Just in summary, the interesting thing here is Dr. Davis, who was plaintiff's formulation expert. Dr. Davis testified. Are you bringing up new issues? I think that this is rebuttal. Just to summarize, I think their arguments are largely arguing about factual findings of the judge. The judge heard conflicting evidence in many cases and made her conclusions. And we submit she got it right. I see my time is way over, and I appreciate it. Thank you, Mr. Wallace. Thank you. Mr. Singer, the case is taken under submission. That concludes the arguments for this morning. All rise.